1  JOSEPH P. RUSSONIELLO (CSBN 44332)
   United States Attorney
2
   BRIAN STRETCH (CSBN 163973)
3  Chief, Criminal Division

4  MARK L. KROTOSKI (CSBN 138549)
   Assistant U.S. Attorney
5

6     1301 New York Avenue, Suite 600
      Washington, D.C. 20530-0016
7     Telephone: (202) 307-6389
      Facsimile: (202) 514-6113
8     E-Mail: Mark.Krotoski@usdoj.gov

9  Attorneys for Plaintiff

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14  UNITED STATES OF AMERICA,          )   No. CR 04-20216 JF
                                        )
15          Plaintiff,                  )
                                        )
16                                      )   Date:  June 18, 2008
        v.                              )   Time:  9:00 a.m.
17                                      )   Court: Hon. Jeremy Fogel
                                        )
18  XIAODONG SHELDON MENG,              )
                                        )
19          Defendant.                  )
                                        )
20

21

22           **GOVERNMENT'S SENTENCING MEMORANDUM**

23

24

25

26

27

28

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF

## **TABLE OF CONTENTS**

I. Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Maximum Penalties And Sentencing Guidelines Calculations . . . . . . . . . . . . . . . . . . . . . . 2

   A. Maximum Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   B. Applicable Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. Case Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   A. Defendant Meng's Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   B. Employment With Competitor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   C. Travel To The United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   D. Criminal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.    Consideration Of The Section 3553(a) Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   1. Nature and Circumstances of the Offense and History and Characteristics of Defendant . . 9

      a.    Nature And Circumstances Of The Offense . . . . . . . . . . . . . . . . . . . . . . . 9

      b.    History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . 15

          (1)    *Criminal History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          (2)    *Personal History And Characteristics* . . . . . . . . . . . . . . . . . . . . . 15

   2. Need To Reflect The Seriousness Of The Offense . . . . . . . . . . . . . . . . . . . . . . . 18

   3. Deterrence Of Criminal Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

   4. Need To Protect The Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

   5. Need To Provide The Defendant With Education . . . . . . . . . . . . . . . . . . . . . . . . . 21

   6. Need to Avoid Unwarranted Disparity In Sentences . . . . . . . . . . . . . . . . . . . . . . . 21

   7. Need To Provide Restitution To Any Victims Of The Offense . . . . . . . . . . . . . . . . . . 21

   8. Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V. Return Of Protective Order Confidential Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VI. Conclusion And Recommended Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1  **EXHIBITS**

2      EXHIBIT A: Copy of Stipulated Interim Protective Order

3      EXHIBIT B: Side-by-side Comparison of Original Screen Shot with Altered Screen

4      EXHIBIT C: Other Screen Shots Obtained in Beijing at the PRC Naval Research Center

5      EXHIBIT D: viXsen USML State Department Determination

6      EXHIBIT E: nVSensor USML State Department Determination

7      EXHIBIT F: Copy of E-mail

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  GOVERNMENT'S SENTENCING MEMORANDUM
    CR 04-20216 JF

1

**TABLE OF AUTHORITIES**

2  CASES

3  *Microsoft Corp. v. AT & T Corp.*, _ U.S. _, 127 S.Ct. 1746 (2007) . . . . . . . . . . . . . . . . . . . . . . 14

4  *United States v. Fei Ye and Ming Zhong*, No. CR 02-20145 JW (NDCA) . . . . . . . . . . . . . . . . 22

5  *United States v. Shea*, 493 F.3d 1110 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6  *United States v. Wilson*, 350 F. Supp.2d 910 (D. Utah 2005) . . . . . . . . . . . . . . . . . . . . . . . . 21

7  STATUTES

8  18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

9  18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10  18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11  18 U.S.C. § 1831 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

12  18 U.S.C. § 1832 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13  18 U.S.C. § 1834 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14  18 U.S.C. § 2314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

15  18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

16  22 U.S.C. § 2751 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17  22 U.S.C. § 2778 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 9, 11

18  50 App. U.S.C. § 2410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19  REGULATIONS

20  22 C.F.R. § 120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

21  22 C.F.R. § 120.6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

22  22 C.F.R. § 121.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

23  22 C.F.R § 123.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

24  22 C.F.R. § 126.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

25

26  GOVERNMENT'S SENTENCING MEMORANDUM
     CR 04-20216 JF

22 C.F.R. § 130 ......................................................... 11

SENTENCING GUIDELINES

U.S.S.G. § 1A1.1 ....................................................... 22

U.S.S.G. § 2B1.1 ........................................................ 3

U.S.S.G. § 2M5.2 ..................................................... 3, 22

U.S.S.G. § 3D1.2 ........................................................ 3

U.S.S.G. § 3E1.1 ........................................................ 3

OTHER AUTHORITIES

H. Rep. No. 788, 104th Cong., 2d Sess. (1996) .............................. 10, 18, 20

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF

I.    Overview

Defendant Xiaodong Sheldon Meng violated two significant national security statutes in this case.  On the first conviction, defendant Meng committed economic espionage by misappropriating a trade secret (Mantis 1.5.5) from his former employer, Quantum3D Inc. ("Quantum3D"), with the intent to benefit a foreign government, specifically the People's Republic of China (PRC) Navy Research Center.[1]  On this violation, defendant Meng used the Mantis 1.5.5 trade secret as part of a demonstration project in attempting to sell products of his new employer, Orad, Hi-Tec Systems Ltd. (Orad), which was a direct competitor of Quantum3D.

On the second conviction, defendant Meng knowingly and willfully exported a defense article that was a United States Munitions List item (defense article viXsen), without authorization from the United States to the PRC in violation of the Arms Control Export Act. Since 1991, the United States has had an embargo for all defense articles and services to the PRC.  viXsen is a Quantum3D  visual simulation software program used for training military fighter pilots who use night visual sensor equipment, including thermal imaging.

As relevant conduct, and as explained further below, the investigation established that defendant Meng had in fact misappropriated two defense articles (known as viXsen and nVSensor; which were exported without authorization), at least six source code products (which were also trade secrets), and more than one hundred materials and utilities belonging to his former employer Quantum3D.  Many of these misappropriated Quantum3D products were intended primarily for military purposes.  Many of these products may be integrated for enhanced features.  For example, Mantis can be used alone or with additional programs (or "plug-ins") for enhanced capabilities to simulate various conditions that arise in flight or battlefield conditions, such as the real-time sensor effects with viXsen and other products.  Additionally, the Quantum3D hardware Obsidian product may be used with ViXsen.  While in the PRC and

---

[1] Quantum3D is a developer of high-end visual simulation systems with some commercial but substantially military applications.  Mantis is a software Image Generator (IG) used for designing visual simulation to render 3D scenes and to simulate motion in the real world for training and other purposes.

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF

1   Southeast Asia, defendant Meng assisted on at least two visual simulation military proposals and

2   met with military and other government entities.

3        There is no dispute on the Sentencing Guideline calculations.  Based on the stipulation of

4   the parties, and recommendations in the presentence report, an Offense Level 23 applies, along

5   with a Criminal History I.  Consistent with the terms of the plea agreement, the government

6   recommends a prison term of twenty-four months in this case (assuming the defendant continues

7   to manifest an acceptance of responsibility through and including sentencing, as required under

8   the plea agreement).[2]  Additionally, a three-year term of supervised release applies along with a

9   mandatory special assessment of $200.  The government also concurs with the probation officer's

10  recommendation of a $10,000 fine as appropriate in this case.  As the presentence report notes,

11  the victim company has decided that restitution is not requested in this case.  PSR ¶ 19.  In his

12  plea agreement, the defendant agreed to forfeit specified hard drives and a lap top computer.

13  Finally, under the Stipulated Interim Protective Order (signed February 16, 2006), the

14  government requests that the defendant return all Confidential Material, including all Digital

15  Media, to the government.  See Exhibit A (copy of Stipulated Interim Protective Order).

16  II.     Maximum Penalties And Sentencing Guidelines Calculations

17      A.    Maximum Penalties

18       The maximum penalties for Count Five, Economic Espionage, in violation of 18 U.S.C. §

19  1831(a)(3), are as follows:

20

21      a.    Maximum prison sentence     15 years

    b.    Maximum fine     $500,000

22

23      c.    Maximum supervised release term     3 years
    d.    Mandatory special assessment     $100

24       The maximum penalties for Count Seven, Arms Export Control Act (AECA) and the

25  International Traffic in Arms Regulations (ITAR), in violation of 22 U.S.C. §§ 2778(b)(2),

26  2778(c), are as follows:

27  _____

28      [2] The specific basis for this sentencing recommendation in this case will be addressed
separately in a sealed filing, consistent with the terms of the signed plea agreement.

|   |     |                                                                                 |                                                                                                             |
|---|-----|---------------------------------------------------------------------------------|-------------------------------------------------------------------------------------------------------------|
|   | a.  | Maximum prison sentence                                                         | 10 years                                                                                                    |
|   | b.  | Maximum fine                                                                    | $1 million or twice the value of the property involved in the transaction, whichever is greater             |
|   | c.  | Maximum supervised release term                                                 | 3 years                                                                                                     |
|   | d.  | Mandatory special assessment                                                    | $100                                                                                                        |

**B.   Applicable Sentencing Guidelines**

As already noted, there is no dispute on the Sentencing Guidelines in this case.  The following Sentencing Guidelines apply, as determined in the Presentence Report, and as stipulated by the parties in the plea agreement:

| | | | |
|---|---|---|---|
| a. | Count Seven: 22 U.S.C. § 2778 (Arms Export Control Act) | | |
| | i. | Base Offense Level, U.S.S.G. § 2M5.2(a)(1) (PSR ¶ 36) | 26 |
| b. | Count Five: 18 U.S.C. § 1831 (Economic Espionage) | | |
| | i. | Base Offense Level, U.S.S.G. § 2B1.1(a)(2) (PSR ¶ 25 ) | 6 |
| | ii. | Misappropriation of Trade Secret to Foreign Government or Instrumentality, U.S.S.G. § 2B1.1(a)(5) (Count Five: 18 U.S.C. § 1831) (PSR ¶ 27 ) | +2 |
| | iii. | Amount Of Loss, U.S.S.G. § 2B1.1(b)(1)(H) (More than $400,000 and not more than $1 million) (Includes all misappropriated materials from Quantum3D) (PSR ¶ 26 ) | +14 |
| c. | Grouping of Closely Related Offenses Under  U.S.S.G. § 3D1.2(c), and the AECA/ITAR (22 U.S.C. §§ 2778(b)(2), 2778(c)), resulting base Offense Level (PSR ¶ 24 ) | | 26 |
| d. | Acceptance of Responsibility: (Assuming U.S.S.G. § 3E1.1 is satisfied) (PSR ¶¶ 32-33, 42-43) | | -3 |
| e. | Total Adjusted Offense Level (Assuming U.S.S.G. § 3E1.1 applies) (PSR ¶ 44) | | 23 |

1    In sum, based on the foregoing, under the Sentencing Guidelines, a Criminal History I,

2    and Offense Level 23 results.  The government submits that the requested sentence of

3    imprisonment is consistent with the statutory purposes of sentencing.  See 18 U.S.C. § 3553(a)

4    (setting forth relevant sentencing factors such as seriousness of offense, just punishment,

5    adequate deterrence, and protection of public, which are discussed further below).

6    In his plea agreement, defendant Meng also agreed to forfeit computer equipment seized

7    during the investigation.

8    III.    Case Summary

9    This case commenced around September 2004 after law enforcement officials received a

10   report that defendant Meng used suspected trade secrets of his former employer and possible

11   United States Munitions List defense articles in the PRC and in Southeast Asia.  The

12   investigation established that defendant Meng had in fact misappropriated two defense articles, at

13   least six source code products (which each constituted separate trade secrets), and more than one

14   hundred materials and utilities belonging to his former employer Quantum3D.  Many of

15   Quantum3D's products are designed primarily for military purposes, including military combat

16   training in simulated real-time conditions during the day and night and the use of advanced

17   infrared (IR), Electro-Optical (EO), and Night Vision Goggle (NVG) devices.  Quantum3D

18   produces visual simulation hardware and software products.  The defendant intended to benefit

19   the PRC Navy Research Center in using the trade secret Mantis 1.5.5 and sought to profit

20   financially from his misappropriation.

21   A.    Defendant Meng's Background

22   Defendant Xiaodong Sheldon Meng, who was born in Cangshan in the Shandong

23   Province of China, received his Bachelor of Science in Engineering degree at the Northeast

24   University in China in 1983.  At the Beijing Normal University, he was awarded a Masters of

25   Science in Physics in 1991.  He also received a Masters in Engineering in 1995 and a Masters of

26   Science in Physics in 1997 from the McGill University in Montreal Canada.  He entered the

27   United States as a Canadian citizen, with an H1-B visa.

28   During June 19, 2000 to March 7, 2003, defendant Meng was a Systems Engineer,

1   Software Engineer, and Applications Engineer at Quantum3D.  Defendant Meng resigned his

2   employment on March 7, 2003, and certified that he had returned all company property.  On

3   March 19, 2003, Meng entered into a consulting services agreement as a sales contractor with

4   Quantum3D, effective date of April 1, 2003.  In a Quantum3D Consulting Services Agreement,

5   defendant Meng once again agreed to return all Quantum3D materials upon any termination.

6   From April 1, 2003 to December 31, 2003, defendant Meng served as a sales contractor for

7   Quantum3D in the PRC.

8          B.     Employment With Competitor

9          Around December 22, 2003, defendant Meng received an offer from Orad, following

10  interviews and reference checks.  [1570]  In January 2004, defendant Meng ended his

11  relationship with Quantum3D and became a manager for Orad, a direct competitor of

12  Quantum3D.  He apparently decided to "pursue other career development opportunities in

13  China."  Quantum3D was surprised to learn that defendant Meng was going to work for a direct

14  competitor.

15         Throughout 2004, defendant Meng met with military and government officials, such as

16  the People's Liberation Army-Air Force (PLAAF) concerning the Orad product DVG10 (Digital

17  Video Graphics), and the Beijing Lantian Aviation Simulation Technology Company (BASC)

18  (also referred to as Beijing Aviation Science and Technology Co., Ltd., and Blue Sky), a

19  subsidiary of China Aviation Industry Corporation I (AVIC I) and the Shenzhen Land Bureau,

20  which are governmental entities within the PRC.

21         In September 2004, defendant Meng prepared a demonstration project for the PRC Navy

22  Research Center in Beijing which included Orad hardware products that he was trying to sell.

23  The demonstration included a four-channel DVG (Digital Video Graphics) unit which was

24  running a significantly altered version of Quantum3D's trade secret Mantis 1.5.5.  The

25  modifications were made after the license for Mantis 1.5.5 was cracked or defeated.  Some of the

26  modifications included substituting the name Quantum3D with the name Orad.  Screen shots

27  were obtained of the demonstration project at the PRC Navy Research Center.  The screen shots

28  clearly established the unauthorized use of a Quantum3D product with numerous alterations,

1   including the substitution of the name Quantum3D with Orad.  See Exhibit B (side-by-side

2   comparison of original screen shot with altered screen).  Quantum3D did not authorize defendant

3   Meng to include Mantis 1.5.5, which was a trade secret, in the demonstration project or to alter it

4   or use it.  Other unauthorized Quantum3D products were installed with the demonstration,

5   including Big Demo (a demonstration program used to highlight the capabilities of Mantis and

6   other Quantum3D products) and a Southwest USA (database demonstration program).  In the

7   demonstration project, defendant Meng intended and knew that the trade secret would benefit a

8   foreign government, including but not limited to the PRC Navy Research Center.  Additionally,

9   the defendant hoped to profit from the demonstration project and use of the Quantum3D trade

10  secret.

11          In 2003 and 2004 in Southeast Asia, defendant Meng also collaborated on at least two

12  separate military visual simulation proposals with other business colleagues.  A review of the

13  defendant's journals and emails along with interviews and other information gathered during the

14  investigation confirmed that the defendant was assisting in developing at least two proposals for

15  two separate Air Forces in Southeast Asia involving visual simulation equipment and source

16  code.  Both proposals promised the transfer and use of source code for the visual simulation

17  products so the military customers could build, maintain and upgrade the simulators in the future.

18  Copies of two F-16 Full Mission Simulator proposals, involving two different countries, were

19  found on defendant Meng's laptop.  On one proposal, the defendant's laptop included one

20  proposal for military simulator upgrades which included references to Mantis and viXsen

21  products as upgrade options.  A second proposal was found which involved simulators for

22  comparable military aircraft.  Defendant Meng served as the engineer on the proposals.

23  Investigators concluded that defendant Meng possessed and was using Quantum3D products,

24  without authorization, in these proposals with foreign governments and customers.

25          Investigators later confirmed that defendant Meng had knowingly and willfully exported

26  two defense articles from the United States, in violation of the Arms Control Export Act.  The

27  Secretary of State has confirmed that the two Quantum3D products, viXsen and nVSensor,

28  constituted Category IX "Military Training Equipment and Training" defense articles United

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF                                                6

1   States Munitions List.  See Exhibits D & E (USML State Department Determinations).

2         C.     Travel To The United States

3         On December 6, 2004, defendant Meng traveled to the United States to attend an annual

4   industry trade show in Orlando, Florida, known as the Interservice/Industry Training, Simulation

5   and Education Conference ("I/ITSEC").  He brought his Dell Inspiron laptop computer and a

6   portable, external hard drive.  A preliminary inspection of the computer at the border confirmed

7   that defendant Meng possessed Quantum3D products.  After preliminary review of the materials

8   on the laptop, Quantum3D confirmed that defendant Meng was not authorized to possess or use

9   the products found on his laptop.

10         In a voluntary interview with agents on December 8, 2003 in Orlando, Florida, defendant

11   Meng admitted possessing Mantis 1.5.5.  He also admitted that while in the PRC, he modified the

12   Mantis application to make it appear that it belonged to Orad.  He admitted possessing Mantis

13   version 1.5.5 which was not available to the public, and that he needed a license to use Mantis.[3]

14   Defendant Meng also admitted that the failure to return the Quantum3D source code and products

15   after his termination with the company was wrong.  During his interview, an agent showed the

16   defendant screen shots of the modified version of the Mantis 1.5.5 which was displayed during

17   the demonstration project Navy Research Center in Beijing.  Upon seeing these screen shots,

18   defendant Meng admitted that he used the altered version of Mantis 1.5.5 in the demonstration

19   project in Beijing.

20         Defendant Meng also acknowledged that he had signed a termination certification on

21   March 7, 2003, certifying that he did not have in his possession, nor did he fail to return any

22   specifications, drawings, blueprints, reproductions, sketches, notes, reports, proposals, or copies

23   of them, or other documents or materials, tools, equipment, or other property belonging to

24   ────────────────

25         [3] Defendant Meng later claimed that someone else assisted him in cracking the Mantis

26   1.5.5 program.  However, on defendant Meng's laptop is a file folder entitled "crack" which
includes a mechanism to defeat or bypass licensing keys or software security measures.

27   Additionally, Meng possessed the source code for viXsen and Mantis which could allow him to
defeat any licensing protections.  Given defendant Meng's engineering background, he was

28   capable of cracking the software program.

1   Quantum3D.  Meng admitted that after signing this certification he retained possession of Mantis

2   source code, the Mantis application, and other Quantum3D property.  He admitted that he had

3   transported the source code into San Jose, California from another state.  When asked why the

4   source code was found on his laptop, defendant Meng responded that when he left Quantum3D

5   he did not delete it.  He acknowledged that his failure to delete the source code was wrong.

6        D.     Criminal Proceedings

7        On December 8, 2004, the Honorable Patricia Trumbull, then-Chief United States

8   Magistrate Judge in the Northern District of California, signed a Criminal Complaint and issued a

9   no-bail arrest warrant based on an affidavit showing probable cause that defendant Meng violated

10  18 U.S.C. 2314 (Interstate/International Transportation of Stolen Property).  In the early morning

11  hours of December 9, 2004, defendant Meng was arrested in his hotel room in Orlando, Florida.

12       An extensive investigation continued, which included interviews with other witnesses, a

13  thorough examination of the materials found on defendant Meng's laptop, and numerous other

14  leads.  The investigation confirmed that defendant Meng was meeting with military and other

15  government officials to sell products and develop visual simulation proposals for military

16  customers.

17       A thorough examination was made of the defendant's laptop.  The information stored on

18  defendant Meng's laptop was voluminous including approximately 100 GB of information and

19  more than 600,000 files on the drives totaling 100 GB in size.  A compiler program was found on

20  the defendant's laptop, which could be used to convert source code into an executable

21  application.  An examination of the laptop confirmed efforts to compile Quantum3D source code,

22  including on June 15, 2003 and August 17, 2003.

23       Investigators also learned that someone deleted more than 900 e-mails from the defendant

24  Meng's Yahoo e-mail account.  In early December 2004, defendant Meng's e-mail account

25  contained approximately 980 emails.  Between December 9, 2004 and January 2, 2005, defendant

26  Meng was in custody by the United States government and could not access his email account.

27  Between December 22, 2005 and January 2, 2005, someone utilizing IP addresses in China,

28  accessed Meng's Yahoo email account and deleted approximately 966 emails.

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF                                     8

1    On December 13, 2006, a Superseding Indictment was filed charging three Conspiracy

2  counts, in violation of 18 U.S.C. § 371; three counts of Economic Espionage, and Attempted

3  Economic Espionage, and aiding and abetting, in violation of 18 U.S.C. §§ 1831(a)(2),

4  1831(a)(3), 1831(a)(4) and 2; two counts under the Arms Export Control Act and aiding and

5  abetting, in violation of 22 U.S.C. § 2778 and 18 U.S.C. § 2; twelve counts of Theft Of Trade

6  Secrets, and Attempted Theft Of Trade Secrets, and aiding and abetting, in violation of 18 U.S.C.

7  §§ 1832(a)(1), 1832(a)(3), 1832(a)(4) and 2; thirteen counts of Foreign and Interstate

8  Transportation of Stolen Property, and aiding and abetting, in violation of 18 U.S.C. §§ 2314 and

9  2; three counts of False Statement To Government Agency, in violation of 18 U.S.C. § 1001; and

10  a Criminal Forfeiture allegation, under 18 U.S.C. §§ 1834 and 50 App. U.S.C. § 2410(g). .

11    On August 1, 2007, defendant Meng pled guilty to Counts Five and Seven of the

12  Superseding Indictment charging him with Economic Espionage, in violation of 18 U.S.C. §

13  1831(a)(3), and a violation of the Arms Export Control Act (AECA) and the International Traffic

14  in Arms Regulations (ITAR), in violation of 22 U.S.C. §§ 2778(b)(2), 2778(c).

15  IV.    Consideration Of The Section 3553(a) Factors

16    As set forth below, the application of the sentencing factors enumerated in 18 U.S.C. §

17  3553(a) supports the requested imprisonment in this case:

18      1.  Nature and Circumstances of the Offense and History and Characteristics of
        Defendant
19

20        a.    Nature And Circumstances Of The Offense

21    Under Section 3553(a)(1), the nature and circumstances of the offense strongly

22  demonstrate the need for the requested prison term.  Based on his conduct, defendant Meng has

23  been convicted of two serious national security statutes, including the Economic Espionage Act

24  (Count Five) and the Arms Export Control Act (Count Seven).  Additionally, the investigation

25  revealed that in 2003 and 2004, defendant Meng was actively involved in two separate military

26  visual simulation proposals while he had unauthorized possession of Quantum3D products.

27    The Economic Espionage Act of 1996, 18 U.S.C. § 1831, was enacted in part to protect

28  our country's economic and national security interests.  As the House Report explained:

1   "For many years federal law has protected intellectual property through the patent and
    copyright laws. With this legislation, Congress will extend vital federal protection to
2   another form of proprietary economic information – trade secrets. There can be no
    question that the development of proprietary economic information is an integral part of
3   America's economic well-being. Moreover, the nation's economic interests are a part of
    its national security interests. Thus, threats to the nation's economic interest are threats to
4   the nation's vital security interests."

5   H. Rep. No. 788, 104th Cong., 2d Sess. 4 (1996).

6       In this case, defendant Meng was convicted for possessing the Quantum3D trade secret

7   Mantis 1.5.5, which he used in a demonstration project with the intent to benefit a foreign

8   government, specifically the PRC Navy Research Center.[4] The trade secret, which involved the

9   use of a military visual simulation program, was displayed at a foreign naval facility.

10      In using the trade secret of his prior employer, defendant Meng also used an altered

11  version of Mantis 1.5.5 to reflect the name of a program (identified as DVG10) which belonged

12  to his new employer, Orad, a direct competitor of Quantum3D. A side-by-side comparison of

13  just one of several screen shots, highlights the alterations used by the defendant in his

14  demonstration project. See Exhibit B. For example, as can be seen, the original Quantum3D

15  name and logo have been removed from the System Properties screen. On the "BigDemo"screen,

16  references to Quantum3D have been replaced with Orad or DVG in several visible instances.

17  Some of the tab options have also been modified. Other comparable alterations were made on

18  other screen pages taken from the demonstration project in Beijing. See Exhibit C (other screen

19  _____

20      [4] The House Report for the Economic Espionage Act explained the application of the
    "intent to benefit a foreign government" element:

21

22      "[A] person will be guilty under this section if they wrongfully copied or otherwise
        controlled a trade secret with the intent to benefit any foreign government, foreign
23      instrumentality or foreign agent. In this instance, 'benefit' is intended to be interpreted
        broadly. The defendant did not have to intend to confer an economic benefit to the
24      foreign government, instrumentality, or agent, to himself, or to any third person.
        Rather, the government need only prove that the actor intended that his actions in
25      copying or otherwise controlling the trade secret would benefit the foreign
        government, instrumentality, or agent in any way. Therefore, in this circumstance,
26      benefit means not only an economic benefit but also reputational, strategic, or tactical
        benefit."
27

28  H. Rep. No. 788, 104th Cong., 2d Sess. 11 (1996).

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF                          10

1    shots obtained in Beijing at the PRC Naval Research Center).

2    The second national security statute, the Arms Export Control Act, 22 U.S.C. § 2778,

3    regulates the export from and import into the United States of "defense articles"[5] and "defense

4    services."[6]  The Arms Export Control Act states the objective of the statute:  "In furtherance of

5    world peace and the security and foreign policy of the United States, the President is authorized

6    to control the import and the export of defense articles and defense services and to provide

7    foreign policy guidance to persons of the United States involved in the export and import of such

8    articles and services. . . ."[7]  Section 2778(a) of the statute authorizes the President to perform

9

10       [5] The International Traffic in Arms Regulations (ITAR) regulations promulgated pursuant
     to the AECA define a "defense article" to be any item or technical data designated on the United
11   States Munitions List, as well as any "technical data recorded or stored in any physical form,
     models, mockups, or other items that reveal technical data directly relating to items designated
12   [in the Munitions List]." See 22 C.F.R. § 120.6 (2005).

13
         [6] The defense articles which are subject to the licensing requirements are designated on
14   the United States Munitions List. Those designations are made by the State Department with the
15   concurrence of the Defense Department, under 22 U.S.C. § 2778(a)(1). The State Department,
     Directorate of Defense Trade Controls (DDTC), promulgates regulations under the AECA, which
16   are known as the International Traffic in Arms Regulations (ITAR). 22 C.F.R. §§ 120-130. The
     ITAR contain the Munitions List, which sets forth twenty-one categories of defense articles and
17   services that are subject to export licensing controls. Id. § 121.1. The United States Munitions
18   List is a catalog of designated "defense articles" subject to export and certain import restrictions.
     Any person who intends to export, or import temporarily, defense articles on the Munitions List
19   from or into the United States, is required to first obtain a license from DDTC. In the application
20   for an export license, the exporter is required to state, among other things, the nature of the
     defense articles to be exported, the end recipient of the defense articles and the purpose for which
21   such articles are intended. These factors and others assist the DDTC in determining whether the
     export of the defense articles would further the security and foreign policy interests of the United
22   States or would otherwise affect world peace.

23       [7] 22 U.S.C. § 2778(a). The Arms Export Control Act further provides:
24
         "[A]n ultimate goal of the United States continues to be a world which is free from the
25   scourge of war and the dangers and burdens of armaments; in which the use of force has
     been subordinated to the rule of law; and in which international adjustments to a changing
26   world are achieved peacefully. In furtherance of that goal, it remains the policy of the
     United States to encourage regional arms control and disarmament agreements and to
27   discourage arms races. The Congress recognizes, however, that the United States and
     other free and independent countries continue to have valid requirements for effective and
28

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF                                    11

three key functions:

    (1)     to designate those items which shall be considered as defense articles and defense services (which will constitute the United States Munitions List);

    (2)     to require licenses for the export of such articles and services; and

    (3)     to promulgate regulations for the import and export of such articles and services.

     In this case, defendant Meng was convicted of willfully exporting the United States Munitions List defense article viXsen source code.[8]  The viXsen product is a visual simulation program used for training military fighter pilots who utilize night visual sensor equipment, including thermal imaging.  Investigators learned that the PRC military and other government entities are very interested in obtaining the visual simulation capabilities of viXsen and related products.

     As relevant conduct, defendant Meng also possessed source code for a second United States Munitions List defense article, nVSensor source code,[9] which is a product used to provide night vision simulation and is exclusively used in military applications for precision training and simulation applications that require high-fidelity NVG and/or IR synthetic environments.  Both viXsen and nVSensor qualify under Category IX of the U.S. Munitions List which applies to

---

mutually beneficial defense relationships in order to maintain and foster the environment of international peace and security essential to social, economic, and political progress. . . ."

22 U.S.C. § 2751.

    [8] On September 1, 2005, the State Department confirmed that the "viXsen" software found on defendant Meng's computer was a defense article covered under the United States Munitions List (USML) under Category IX(c).  Consequently, no person could transport "viXsen" into or out of the United States without a license from the State Department.  See Exhibit D (viXsen USML State Department Determination).

    [9] On March 14, 2006, the State Department confirmed that the "nVSensor" software found on defendant Meng's computer was a defense article covered under the United States Munitions List (USML) under Category IX(c).  Consequently, no person could transport "nVSensor" into or out of the United States without a license from the State Department.  See Exhibit E (nVSensor USML State Department Determination).

1   "Military Training Equipment and Training."  The source code for viXsen and nVSensor also

2   constitute separate trade secrets of Quantum3D.

3        Defendant Meng was engaged in a series of presentations and proposals involving visual

4   simulation products, as reflected in his seized journal and other evidence.  In addition to these

5   presentations, and the PRC Navy Research Center demonstration in Beijing, investigators learned

6   that the defendant was actively involved with two other proposals to foreign governments

7   concerning visual simulation products.  In fact, the defendant's laptop included one proposal for

8   military simulator upgrades which included references to Mantis and viXsen products as upgrade

9   options.  A second proposal was found which involved simulators for comparable military

10  aircraft.

11       After severing his ties with Quantum3D, defendant Meng discussed the use of

12  Quantum3D products which he had in his possession as part of other ongoing ventures and

13  military proposals.  For example, in a June 20, 2004 e-mail, defendant Meng e-mailed a business

14  colleague concerning viXen and Mantis:

15      "From: meng sheldon [mailto: smeng_cn@yahoo.com.cn]
    Sent: Sunday, June 20, 2004 2:08 AM

16      To:  [*redacted*]
    Cc:  [*redacted*]

17      Subject: Sensor

18      If we go for ViXen for Sensor, we'd better go for Mantis for OTW [out the window] at the same time, or
    Vega Prime/CTS should go together, for the sake of consistency. If we choose a terrain toolf from one

19      vendor and a development tool from another vendor, we will have tough time to get good support from
    both, like the case of Q3D and Terrex.

20
    I have genius engineers in China who are interested in developing Sensor SW with OSG.  But that will

21      involve some R&D fee to start with. It's a serious endeavour.

22      Regards,
    Sheldon

23
    [*redacted*] wrote:

24
    What about Vixen? Could we use it with OSG as long as the sensor is not in the O-T-W?

25      What about CTS could we still use OSG with it as a separate channel and then make sure that the data is
    correlated?"

26

27  There was no authorization for defendant Meng to use viXsen, a restricted defense article under

28  the Arms Control Export Act, Mantis 1.5.5 or other Quantum3D source code and products during

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF              13

this period.

The nature of the misappropriated products are also significant.  The products include two United States Munitions List defense articles, at least six source code products,[10] and more than one hundred other materials which are primarily used for military visual simulation purposes.[11] The source code was located in several places on Meng's computer.  One zip file contained all of the source code for Mantis and various plug-ins for Mantis.  Investigators found the following *source code* products on the defendant's laptop, which also constitute separate trade secrets:

| Source Code Product | Description |
|---|---|
| Mantis source code version 1.4.5 ER3 | A software Image Generator (IG) used for designing visual simulation to render 3D scenes and to simulate motion in the real world for training and other purposes |
| viXsen source code | • A visual simulation program used for training military fighter pilots who utilize night vision sensor equipment, including thermal imaging.<br>• As a U.S. Munitions List defense article, viXsen is regulated under United States International Traffic in Arms Regulations ("ITAR") |

---

[10] One recent case explained the role of source code:

"'Source code' is essentially a set of directions that a programmer writes in text form.  When the source code is complete, the programmer runs the code through a 'compiler' that produces 'object code' in a language that only the computer can read.  See Microsoft Corp. v. AT & T Corp., _ U.S. _, 127 S.Ct. 1746, 1754 n.8 (2007) ("Software in the form in which it is written and understood by humans is called source code.  To be functional, however, software must be converted (or compiled) into its machine-useable version, a sequence of binary number instructions typed object code.") (internal citation and quotations omitted)).  The government witnesses analogized this distinction in two ways: First, the source code as the recipe for a pie, and the object code as the actual pie.  Second, the source code can be seen as the design for an assembly line, and the object code as the assembly line itself."

United States v. Shea, 493 F.3d 1110, 1116 n.1 (9th Cir. 2007) (citation omitted).

[11] During a forensic review of defendant Meng's computer, numerous Quantum3D products, applications, utilities, demos and presentations were discovered.  In addition to the source code noted above, this included various plug-ins for Mantis, such as ChannelMask; Audition; Detailer; Open GVS; Splicetree; Mantis Server; Vtree key; the Mantis application; user manuals; and demonstrations, such as, Big Demo, Airport and Southwest USA.  A zip file contained 10,899 files all belonging to Quantum3D.

| nVSensor source code | • Provides night vision simulation and operated in conjunction with viXsen and supported special effects including blur, noise, scintillations, gain, bias, reticles and symbology, automatic gain control, polarity inversion, and white-hot/black-hot settings<br>• As a U.S. Munitions List defense article, nVSensor is regulated under United States International Traffic in Arms Regulations ("ITAR") |
| Channel Mask source code | A plug-in used to crop an image being displayed so that the image fit the display, such as the windshield of a cockpit |
| Audition source code version 4.1.0.46 | A tool which validates the functionality of 3D models when integrated into Mantis, and supports real-time viewing and manipulation of 3-D data |
| Vtree source code version 4.0 | A comprehensive 3D graphics toolkit used to convert 3D models into a format which would be usable by Mantis |

On December 8, 2004, defendant Meng admitted to possessing source code for Mantis, acknowledged that it was wrong for him to possess it, and admitted that he authorized the alteration of the Mantis application to alter the program's appearance in an attempt to convince potential customers that this was an application belonging to Orad. The source code that defendant Meng admitted misappropriating was created about the same time as other source code found in defendant Meng's possession, suggesting that the source code was misappropriated at about the same time.

        b.    History and Characteristics of the Defendant

        (1)   *Criminal History*

Under Section 3553(a)(1), the defendant does not have any prior criminal convictions, as noted in the Presentence Report.

        (2)   *Personal History And Characteristics*

Under Section 3553(a)(1), the personal history and characteristics of the defendant reveal a highly educated person who was motivated by profit and a level of sophistication and disregard for conforming his conduct to the law, rules, commitments and obligations, which further warrants his imprisonment for a significant period of time.

As part of his financial motivation, the defendant was willing to use his former employer's products to help sell the products of his new employer, who he knew was a direct competitor of Quantum3D. As defendant Meng admitted in his plea agreement:

"I was not authorized to possess or have access to the source code for viXsen and Mantis

1        1.5.5.  I misappropriated these items because I thought that I could use and profit from
2 them after leaving Quantum3D."

3       The investigation also demonstrated the defendant's propensity to disregard rules,

4 commitments, and obligations.  For example, in June 19, 2000, defendant Meng signed

5 Quantum3D's "Employee Proprietary Information Agreement" which required him upon leaving

6 the company to deliver and not keep in his possession any property belonging to Quantum3D.  In

7 this agreement, defendant Meng agreed to safeguard the company's confidential information:

8      "I agree at all times during the term of my employment and thereafter to hold in strictest
confidence, and not to use, except for the benefit of the Company, or to disclose to any
9 person, firm or corporation without written authorization of the Company, any trade
secrets, confidential knowledge, data or other proprietary information relating to
10 products, processes, know-how, designs, formulas, developmental or experimental work,
computer programs, data bases, other original works of authorship, customer lists,
11 business plans, financial information or other subject matter pertaining to any business of
the Company or any of its clients, consultants, or licensees." [¶ 1(a)] [066]

12

13 In leaving the company on March 7, 2003, defendant Meng falsely certified the following

14 statement:

15      "This is to certify that I do not have in my possession, nor have I failed to return,
any specifications, drawings, blueprints, reproductions, sketches, notes, reports,
16 proposals, or copies of them, or other documents or materials, tools, equipment, or other
property belonging to Quantum3D (the 'Company')."  [Exh. A] [071]

17

18 In his Quantum3D Consulting Services Agreement in the PRC (signed March 19, 2003 and

19 effective April 1, 2003), defendant Meng once again expressly agreed to return all Quantum3D

20 materials upon any termination:

21      "Upon termination of this Agreement for any reason, Consultant shall promptly return to
Quantum3D (I) all records, materials, equipment, drawings and documents which are
22 owned, leased or licensed by Quantum3D; and (ii) any data of any nature pertaining to or
incorporating any Confidential Information of Quantum3D, including any copies thereof,
23 regardless of when obtained by or made available to Consultant...." [¶ 2.4] [059]

24 In the same agreement, defendant Meng agreed to protect confidential information and trade

25 secrets:

26      "Consultant agrees to keep confidential and not to disclose or make any unauthorized use
of any trade secrets, confidential information, knowledge, data or other information of
27 Quantum3D relating to products, research and development activities, processes,
software, titles, concepts, know-how, designs, forumlas, test data, customer lists, business
28 plans, marketing plans and strategies, and pricing strategies or other subject matter

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF          16

1   pertaining to any business or research of Quantum3D, or any of Quantum3D's clients,
2   customers, consultants, licensees or affiliates, or which Consultant knows or has reason to
    know is considered confidential by Quantum3D (collectively referred to herein as
3   'Confidential Information/), which Consultant may have produced, obtained, learned or
    otherwise acquired during the course of rendering services to Quntum3D (including, but
4   not limited to, the Services). Consultant's duty to maintain such Confidential Information
    in confidence hereunder shall survive the termination of this Agreement for a period of
5   five (5) years, except to the extent that any such Confidential Information becomes
    generally known in the industry through no direct or indirect fault of Consultant.
6   Consultant agrees to use such Confidential Information solely in connection with the
    performance of Services and for no other purpose." [¶ 4.1] [060]

7   In an email to Quantum3D on January 15, 2004, defendant Meng acknowledged his obligation to

8   return Quantum3D materials and not disclose confidential information by promising: "I will

9   observe NDA [non-disclosure agreement] clauses with Q3D signed last March. [1190]  In

10  December 2004, defendant Meng admitted and acknowledged that he had retained Quantum3D

11  property without permission and which he knew he was not entitled to retain, possess or use.  In

12  Orlando, Florida, in a voluntary interview with federal agents, Meng admitted possessing source

13  code for Mantis,[12] acknowledged that it was wrong for him to possess it, and admitted that he

14  authorized the alteration of a separate Mantis application to alter the program's appearance.

15          Defendant Meng also willfully violated export laws.  Defendant Meng was familiar with

16  the export restrictions for United States Munitions List materials during his employment at

17  Quantum3D.  Two months before he resigned his position with Quantum3D, defendant Meng

18  was told on January 3, 2003, and with a "Subject" line of "RE: ViXsen demo", by another

19  Quantum3D employee:

20      "Sheldon:

21      Since nvsensor and vixsen are under export control and on the munitions list, we would most likely need an
        export license to do this.  I would make this a low priority as I may have to order you to remove the
22      software and hardware from the system."

23  _____

24      [12] In Count Nine of the Superseding Indictment, defendant Meng was charged with the
    trade secret theft of "Mantis source code version 1.4.5 ER3." This Mantis source code was found
25  on his laptop. Defendant Meng's plea agreement did not include this charge, as he pled to two
    more serious violations than trade secret theft. Investigators concluded the Mantis 1.4.5 ER3 was
26  the Mantis source code defendant Meng admitted misappropriating from Quantum3D. During the
    same interview with the case agents, defendant Meng also admitted retaining the Mantis 1.5.5
27  program, which was a separate trade secret and formed the basis for the Economic Espionage Act
28  conviction in Count Five.

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF                                17

1   Defendant Meng responded that he understood.  About two weeks later, defendant Meng

2   persisted in his efforts.  In an email message dated January 15, 2003, and with a "Subject" line of

3   "ViXsen Demo request", Meng wrote the following message:

4

5   ". . . If it's convenient for you, would you please wrap up a ViXsen demo and put it to a ftp site, so that I
    can download it from my side in S Korea?  Any simple demo will suffice.  Please include a simple
6   instruction on how to set it up and run it.

7   Thank you.

8   Sheldon"

9   The following reply was sent to defendant Meng and another employee:

10  "Please ignore this request.  I have explained the export restrictions to Sheldon again and he understands we
    cannot show this without a temporary export license.  We do not need any software at this time."
11

12      As relevant conduct, another example reveals the defendant's intentional theft of

13  Quantum3D property.  In July 2004, defendant Meng e-mailed a colleague with whom he was

14  working on two military proposals:

15  "Last year Scott sent me a Obsidian FX for demo from US.  I didn't return it back when I
    left Q3D because Q3D still owes me salary and travel expenses."
16

17  See Exhibit F (copy of e-mail).  Not only did the defendant intentionally steal property that did

18  not belong to him, he sought to rationalize it.  The Obsidian product also related to one of the

19  source code trade secrets that defendant Meng possessed, nVSensor, which operates in

20  conjunction with viXsen by using Quantum3D hardware, including AAlchemy and Obsidian

21  graphics subsystems.[13]

22

23  ─────────────────

24      [13] Ironically, the House Report accompanying the Economic Espionage Act also described
    the problem of theft by disgruntled employees who seek financial gain at their former company's
25  expense:

26  "The information is pilfered by a variety of people and organizations for a variety of
    reasons.  A great deal of the theft is committed by disgruntled individuals or employees
27  who hope to harm their former companies or line their own pockets."

28  H. Rep. No. 788, 104th Cong., 2d Sess. 5 (1996).

1          2.     Need To Reflect The Seriousness Of The Offense

2          Under Section 3553(a)(2)(A), the requested prison term is necessary to reflect the

3    seriousness of the defendant's conduct, promote respect for the law, and provide just punishment

4    for the offense.  As already noted, both statutes protect the national security interests of the

5    United States.  For example, under Section 1831, the Economic Espionage Act prohibits the

6    misappropriation of trade secrets with the intent to benefit a foreign government.  In this case, the

7    defendant sought personal profit by using the trade secret Mantis 1.5.5 to sell products of a

8    competitor of his former employer to the PRC Navy Research Center.

9          Additionally, the Arms Export Control Act prohibits the export of listed defense articles

10   which could jeopardize technological and other advantages of the United States.  In this case, the

11   export of viXsen was significant because this visual simulation software program is used for

12   training military fighter pilots who use night visual sensor equipment, including thermal imaging.

13   To date, the Unites States maintains a significant technological and military advantage on the

14   night vision and thermal imaging matters.  Consequently, the United States maintains a military

15   advantage during night time operations.  Most foreign countries do not have the same or similar

16   night time capabilities.  In the wrong hands, this advantage would be lost.  In part, this is why

17   viXsen had been deemed to be a defense article under the Arms Export Control Act.

18   Additionally, certain countries are prohibited from receiving any regulated defense articles.  The

19   PRC is designated as one of these countries.  See 22 C.F.R. § 126.1(a).[14]  A separate concern is

20   _____

21        [14] Section 126.1(a) provides:

22        "(a) General.  It is the policy of the United States to deny licenses and other approvals for
          exports and imports of defense articles and defense services, destined for or originating in
23        certain countries.  This policy applies to Belarus, Cuba, Iran, Libya, North Korea, Syria
          and Vietnam.  This policy also applies to countries with respect to which the United States
24        maintains an arms embargo (e.g., Burma, China, Haiti, Liberia, Somalia, and Sudan) or
          whenever an export would not otherwise be in furtherance of world peace and the security
25        and foreign policy of the United States.  Information regarding certain other embargoes
          appears elsewhere in this section.  Comprehensive arms embargoes are normally the
26        subject of a State Department notice published in the Federal Register.  The exemptions
          provided in the regulations in this subchapter, except §123.17 of this subchapter, do not
27        apply with respect to articles originating in or for export to any proscribed countries, areas,
28

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF                              19

1    that some individuals in the PRC might be willing to share defense articles with other countries

2    which would also be prohibited from receiving them.  The sentence should reflect these concerns.

3                    3.    Deterrence Of Criminal Conduct

4          By enacting the Economic Espionage Act, Congress sought to deter misappropriation of

5    trade secrets.  After noting the inability of prior law to address misappropriation of trade secrets,

6    the House Report noted that one of the goals was deterrence:  "These problems underscore the

7    importance of developing a systematic approach to the problem of economic espionage.  The

8    Committee believes that such a scheme will serve as a powerful deterrent to this type of crime."

9    H. Rep. No. 788, 104th Cong., 2d Sess. 7 (1996).  The Arms Control Export Act addresses related

10   national security concerns by restricting the export of defense articles without prior permission.

11         By imposing the recommended prison sentence, under Section 3553(a)(2)(B), the Court

12   has the opportunity to have a meaningful specific and general deterrent effect.  The defendant

13   will be specifically deterred from committing more crimes.  Moreover, the prison sentence will

14   deter others from committing similar offenses.

15                   4.    Need To Protect The Public

16         Under Section 3553(a)(2)(C), the public needs to be protected from individuals who

17   commit economic espionage and export violations, like the defendant.  The misappropriation of

18   trade secrets and willful export of defense articles can take many forms.  For example, as the

19   House Report noted concerning the Economic Espionage Act:

20             "It is important, however, to remember that the nature and purpose of industrial espionage
              are sharply different from those of classic political or military espionage.  The phrase
21            industrial espionage includes a variety of behavior – from the foreign government that
              uses its classic espionage apparatus to spy on a company, to the two American companies
22            that are attempting to uncover each other's bid proposals, or to the disgruntled former
              employee who walks out of his former company with a computer diskette full of
23            engineering schematics.  All of these forms of industrial espionage are problems.  Each
              will be punished under this bill."
24
     H. Rep. No. 788, 104th Cong., 2d Sess. 5 (1996).
25
           The public should be protected from individuals like defendant Meng who intentionally
26
     misappropriate trade secrets with the intent to benefit foreign governments.  This becomes all the
27

28   _____

           or persons in this §126.1."

1   more important when the misappropriation also involves, as here, the willful exporting of defense

2   articles. The requested prison term, along with the three-year term of supervised release, will

3   serve to protect the public.

4              5.      Need To Provide The Defendant With Education

5          As already noted, the defendant has received multiple degrees (including a Bachelor of

6   Science in Engineering; two Masters of Science in Physics; and one Masters in Engineer) in the

7   PRC and Canada. Any need to provide the defendant with education and vocational skills under

8   Section 3553(a)(2)(D), while important in many contexts, is subordinate in this case to the

9   important considerations of deterrence, protection of the public and the need for the sentence to

10  reflect the seriousness of the offense. *See United States v. Wilson*, 350 F. Supp. 2d 910, 921-22

11

12  (D. Utah 2005) (noting that legislative history of Sentencing Reform Act demonstrates that

13  Congress intended to place rehabilitation as a secondary consideration where serious crimes were

14  involved). The defendant will have access to many programs in the prison system to which he

15  can avail himself. Neither the presence nor absence of any further educational programs should

16  weigh heavily in this Court's sentencing determination, in this case.

17             6.      Need to Avoid Unwarranted Disparity In Sentences

18         On "the need to avoid unwarranted sentence disparities among defendants with similar

19  records who have been found guilty of similar conduct," under Section 3553(a)(6), this case

20  stands alone in many respects. First, the defendant's conviction under the Arms Control Export

21  Act is the first one concerning a United States Munitions List defense article involving source

22  code, according to the Department of State. Second, while this is the third case charging

23  violations under Economic Espionage Act Section 1831, and the second case resulting in a

24  conviction under Section 1831,[15] this case represents the first sentencing under that provision.

25  This is also the first case in which a defendant has been convicted of both of these national

26

27         [15] The first convictions under Section 1831 resulted on December 14, 2006, in United

28  States v. Fei Ye and Ming Zhong, No. CR 02-20145 JW (NDCA). The sentencing for defendants
    Ye and Zhong remains pending.

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF                                    21

1    security statutes.

2        Against this backdrop, the Sentencing Guidelines represent the best starting point for

3    determining the sentence.  As explained by the Sentencing Commission:

4        "In determining the appropriate sentencing ranges for each offense, the commission
         began by estimating the average sentences now being served within each category. . . .
5        While the Commission has not considered itself bound by existing sentencing practice, it
         has not tried to develop an entirely new system of sentencing on the basis of theory alone.
6        Guideline sentences in many instances will approximate existing practice, but adherence
         to the guidelines will help to eliminate wide disparity."

7    U.S.S.G. § 1A1.1, Chap. 1, Introduction at 4(g), at 7 (Guidelines Manual Nov. 2007).

8        Additionally, the Sentencing Commission has added:

9
         "For now, the Commission has sought to solve both the practical and philosophical
10       problems of developing a coherent sentencing system by taking an empirical approach
         that uses data estimating the existing sentencing system as a starting point.  It has
11       analyzed data drawn from 10,000 presentence investigations, crimes as distinguished in
         substantive criminal statutes, the United States Parole Commission's guidelines and
12       resulting statistics, and data from other relevant sources, in order to determine which
         distinctions are important in present practice.  After examination, the Commissions has
13       accepted, modified, or rationalized the more important of these distinctions."

14   Id. at § 3, page 3.  Finally, "the guidelines represent an approach that begins with, and builds

15   upon, empirical data."  Id. at §3, page 4.

16       For the Arms Export Control Act, the Sentencing Commission has recommended Offense

17   Level 26 should apply, under U.S.S.G. § 2M5.2(a)(1).  In this case, the parties have agreed that

18   Offense Level 26 also results for the Economic Espionage Act violation, based on U.S.S.G. §

19   U.S.S.G. §§ 2B1.1(a)(2) (base); 2B1.1(a)(5) (misappropriation of trade secret to foreign

20   government or instrumentality), and 2B1.1(b)(1)(H) (amount of loss).  With that starting point,

21   there are other unique factors that apply, which are noted in a separate sealed filing, that support

22   the recommended sentence in this case.

23              7.    Need To Provide Restitution To Any Victims Of The Offense

24       The need to provide restitution to Quantum3D is not an issue in this case.  18 U.S.C.

25   § 3553(a)(7).  As noted by the probation officer, on the issue of restitution, Quantum3D has

26   indicated through outside counsel: "in light of the significant violations to which Mr. Meng has

27   pled guilty and the fact that he is likely to be sentenced to a prison term for these violations,

28   Quantum3D will not insist on restitution in this matter."  PSR ¶ 19.

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF                                    22

8.   Summary

As discussed above, the Section 3553(a) sentencing factors support the requested imprisonment in this case. The defendant violated two significant national security statutes in this case. Defendant Meng used a trade secret of his former employer at a demonstration project in Beijing with the intent to benefit a foreign government, specifically the PRC Navy Research Center. He willfully exported a defense article which included a visual simulation software program used for training military fighter pilots who utilize night visual sensor equipment, including thermal imaging. He sought to profit financially from his endeavors. As relevant conduct, his misappropriation of his former employer's products included two defense articles, at least six source code products, which were also trade secrets, and more than one hundred materials and utilities belonging to his former employer Quantum3D and which were primarily used for military purposes. Based on the seriousness of these national security offenses, the need to promote deterrence, and protect the public, the government urges the Court to impose the requested prison term in this case. Finally, as already noted, the specific basis for the sentencing recommendation in this case will be addressed separately in a sealed filing, consistent with the terms of the signed plea agreement.

V.   Return Of Protective Order Confidential Materials

The defense previously agreed to return all Confidential Material, including all Digital Media, to the government at the conclusion of the case. See Exhibit A (copy of Stipulated Interim Protective Order (signed February 16, 2006)). The government will request this property be returned at the sentencing hearing.

// // //

// // //

1    VI.    Conclusion And Recommended Sentence

2            Based on the foregoing, and consistent with the terms of the plea agreement, and the

3    sealed filing in this case, the government respectfully requests that the Court sentence the

4    defendant to a twenty-four month term of prison, a three year terms of supervised release, a

5    mandatory special assessment of $200, a fine of $10,000, and order forfeiture of the computer

6    equipment listed in the plea agreement.  Finally, in the plea agreement, the defendant waived

7    appeal of his convictions, the judgment, and orders of the court, and any aspect of his sentence,

8    including any orders relating to forfeiture.

9    Dated: June 11, 2008                              JOSEPH P. RUSSONIELLO
                                                        United States Attorney

10

11

12                                                      MARK L. KROTOSKI
                                                        Assistant United States Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

UNITED STATES v. XIAODONG SHELDON MENG,
NO. CR 04-20216 JF

I, Glenn Gordon, declare that I am a citizen of the United States, over the age of 18 years and not a party to the within action.

I hereby certify that a copy of the foregoing:

**GOVERNMENT'S SENTENCING MEMORANDUM**

was served today ___by hand; ___by facsimile; ___by Federal Express; __**X**_by first class mail by placing a true copy of each such document(s) in a sealed envelope with postage thereon fully paid, either in a U.S. Mail mailbox or in the designated area for outgoing U.S. Mail in accordance with the normal practice of the United States Attorney's Office; ___by placing in the Public Defender's pickup box located in the Court Clerk's Office.

Lori Timmons
United States Probation Officer
United States Probation Office
Northern District of California
280 South First Street
San Jose, CA 95113
Fax (408) 535-5206

Manual Urquidez Aldapa Araujo, Esq.
Office of the Federal Public Defender
Northern District of California
160 West Santa Clara Street, Suite 575
San Jose, CA 95113
Fax (408) 291-7399

I declare under penalty of perjury that the foregoing is true and correct, and that this certificate was executed at San Jose, California

DATED: June 11, 2008

GLENN GORDON
Paralegal
CCIPS, Criminal Division
U.S. Department of Justice

GOVERNMENT'S SENTENCING MEMORANDUM
CR 04-20216 JF