BARRY J. PORTMAN
Federal Public Defender
MANUEL U. ARAUJO,
Assistant Federal Public Defender
160 West Santa Clara Street, Suite 575
San Jose, CA 95113
Telephone: (408) 291-7753

Counsel for Defendant MENG

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 04-20216- JF |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S REPLY TO THE** |
| v. | ) | **GOVERNMENT'S SENTENCING** |
| | ) | **POSITION** |
| XIAODONG SHELDON MENG, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

1.  <u>Mr. Meng Did Not Use the viXen Source Code or the nVSensor Source Code for Any
    Purpose.</u>

        Pursuant to the plea agreement Mr. Meng pled guilty to one count of knowingly and

willfully exporting a defense article that was a United States Munitions List item (defense article

viXen), without authorization from the United States to PRC in violation of the Arms Control

Act. Exporting a defense article is all to which Mr. Meng has pled guilty, he has not pled guilty

nor is there any evidence that he used the viXen source code or the nVSensor source code for any

purpose, contrary to the suggestion by the government's sentencing memorandum. [Gov't

Memorandum, page 1: 15-24.] Mr. Meng has not pled guilty to and has not admitted to using, or

attempting to use, the viXen source code or the nVSensor source code found in his computer for

the purpose of compiling a visual simulation software program used for training military fighter pilots who use night vision sensor equipment, including thermal imaging. In other words, while Mr. Meng may have had in his possession the recipe to bake a pie, there is no evidence that he ever attempted to bake a pie. Yet, the government by conflating the viXen source code with the full attributes of the viXen program (which Mr. Meng admittedly did not possess) gives the impression that Mr. Meng had every intention of using viXen for his own profit.[1]

The implication under relevant conduct that Mr. Meng intended to compile a visual simulation software program from the source code found on his computer is an overreach not supported by the evidence and amounts to speculation.[2] [Gov't Memorandum, page 1: 15-24.] There is no evidence that Mr. Meng ever attempted to plug-in the viXen program into his demonstration project for the PRC Navy Research Center in Beijing.[3] As previously stated the primary purpose of that demonstration was to sell the Orad, Hi-Tec Systems Ltd. (Orad)

---

[1]

After correctly stating that Mr. Meng had in his possession viXen and nVSensor in his laptop computer, the government goes on to describe the viXen program's capabilities. It also ties in the fact that it can be used as a plug-in to Mantis. First, Mr. Meng did not have the viXen program described by the government and the source code is not a plug-in to Mantis. Mr. Meng used Mantis without a viXen plug-in. As the government correctly points out, Mantis can be used alone. [Gov't Memorandum, page 1: 15-24.]

[2]

The government asserts that Meng also collaborated on at least two separate military visual simulation proposals with other business colleagues and that the defendant's Journal and e-mails along with interviews and other information gathered during the investigation confirmed that the defendant was assisting in developing at least two proposals for two separate Air Forces in Southeast Asia involving visual simulation equipment and source code which promised the transfer and use of source code for the visual simulation products to the military customers could build, maintain and upgrade the simulators in the future. It also alleged that the defendant's laptop included one proposal for military simulator upgrades which included references to Mantis and viXen products as upgrade options. [Gov't Memorandum, pg. 6: 11-24.] As will be discussed herein, this does not evidence an intent to steal the viXen or Mantis software for resale, but evidences that this software is an option for the customer. References to "visual simulation equipment and source code which promised the transfer and use of source code for the visual simulation products to the military customers could build, maintain and upgrade the simulators in the future" does not refer to viXen or Mantis, but refers to open source graphic software.

[3]

In order to have done this he would have needed to compile the program from the source code. There is no evidence that he ever attempted to do so.

hardware product. Mr. Meng was not selling the software. What is more important, Mr. Meng did not have possession of the viXen program. Additionally, the Orad hardware could be operated by other simulation software programs available on the market. In fact, Mantis 1.5.5. was available to the PRC, as Mantis is not subject to the licensing jurisdiction of the Department of State. [Government's Exhibit D: pg. 2.] That is, it was not on the United States Munitions List and could without authorization from the United States State Department be exported from the United States and sold in the PRC.[4]

The Government strongly suggests under relevant conduct that Mr. Meng had plans to use the viXen source codes to compile his own version of the viXen Program. [Gov't Memorandum, pg. 6: 11-24.] First, Mr. Meng did not use any of the source codes found in his possession for the purpose of compiling a program from the source code. Perhaps the best evidence of Mr. Meng's intent is the June 20, 2004 email set forth in the Government's sentencing memorandum at page 13, lines 14 - 25. The e-mail as set forth in the government's memorandum reads in part as follows:

Meng wrote,

If we go for viXon for sensor, we'd better go for Mantis for OTW [out of window] at the same time, or Vega Prime/CTS should go together, for the sake of consistency. If we choose a terrain tool from one vendor and a development tool from another vendor, we will have tough time to get good support from both, like the case of Q3D and Terrex. (Emphasis added.)

I have genius engineers in China who are interested in developing sensor SW with OSG. But that will involve some R&D fee to start with. It's a serious endeavor.

[*redacted] wrote:

What about viXen? Could we use it with OSG as long as the sensor is not in the O-T-W? What about CTS could we still use OSG with it as a separate channel and then make sure that the data is correlated?"

---

[4]

The Department of State determined that the Mantis version 1.0 or higher is not subject to the licensing jurisdiction of the Department of State. [Government's Exhibit D, pg. 2.] "These software products are dual-use and require no modification for military." [Exhibit D: June 14, 2002, letter, pg. 2.]

1

2      A fair reading of this email reveals that what Mr. Meng is actually saying, is that

3  whatever software they utilize to operate the hardware, the software should come from the same

4  vendor, otherwise they will have difficulty getting good technical support should something go

5  wrong with the integration of the programs.  Had Mr. Meng intended to compile his own

6  program using the viXen source code or the nVSensor source code, he would not be concerned

7  about the ability to obtain good technical support for their end product.  He would only be

8  concerned about being able to get good technical support if his intent was to buy the product (or

9  have his customer buy the software product) from Quantum3D or another vendor.  The logic of

10 Mr. Meng's words runs counter to the government' s implication that Mr. Meng had appropriated

11 viXen and/or the nVSensor source code with the intent to create his own operating program.

12      The email also reads that Mr. Meng has "genius engineers in China who are interested in

13 developing sensor SW (Software) with OSG  (Open Source Graphics).  First, the word "sensor"

14 is a generic term, not specific to nVSensor.  Nowhere does Mr. Meng use the terms viXen,

15 nVSensor and/or Mantis in connection with developing their own sensor software.  The only

16 software he mentioned in connection with developing sensor software is software which is Open

17 Source Graphics which is publicly available, not a trade secret, and not restricted by the

18 Department of State Munitions List.  Additionally, CTS is a competitor of Quantum3D, and is

19 not a stolen or misappropriated trade secret.

20 2.      Mr. Meng Did Not Steal the Mantis Program.

21      It is obvious from Government's Exhibit B that Mantis 1.5.5 was created on March 28,

22 2003.   ICE represented that Meng departed the United States on March 26, 2003 on a flight to

23 Taipei, Taiwan using a Canadian passport.  [Criminal Complaint; ¶ 9.]   It follows that Mr. Meng

24 could not have obtained a copy of the Mantis 1.5.5 program while he was in the United States, as

25 it was created or released after he left the United States.  As agreed between the parties, Mr.

26 Meng obtained a copy of Mantis 1.5.5. outside the United States, from Quantum3D's own

distributor in China.

Meng did not steal the Mantis program. He and Quantum3D entered into a consulting services agreement in which Meng took on the duties of sales contractor on March 19, 2003, with an effective date of April 11, 2003. Nevertheless, the Complaint's Affidavit claims that "based on company policy victim company asserts that between March 7, 2003 and March 19, 2003, Meng was not given authorization to possess any victim company property since he was then no longer an employee of the victim company." [Criminal Complaint ¶10.] The clear implication of the above allegations found in the complaint is that Mr. Meng stole Quantum3D property because between March 7 and March 19, 2003, he did not have authority to possess their trade secret property. However, as the March 20, 2003, Quantum3D commercial invoice demonstrates,[5] Mr. Meng was provided with demo hardware by Quantum3D for use in his new capacity as a sales contractor/independent consultant in Asia for Quantum3D. In his capacity as a sales contractor/independent consultant downloaded a number of Quantum 3D software products, including the zip file containing an older version of the Mantis source code, version 1 .4.5 ER3, nVSensor source code and the viXen source code. These files were part of a zip file containing a multitude of files some of which were necessary to enable him to service the Quantum3D customers in Asia.[6] When Mr. Meng downloaded this zip file, it was not with the intent to use the source codes to compile his own operating software program.

That Quantum3D provided Mr. Meng with the tools necessary to fulfill his contract with them is further reflected by Mr. Meng's email dated July 27, 2004 (attached to the Government's pleadings as Exhibit F) which makes clear that the Obsidian FX demo was sent to him by

---

[5] Attached to defendant's Sentencing Memorandum as Exhibit 3 .

[6] One zip file contained all of the source codes for Mantis and various plug-ins for Mantis. [Government Memorandum, pg. 14: 4-11 – 15: 1-9.]

Quantum3D[7]. It is only logical that software would be necessary to operate the demonstration hardware.

3. Mr. Meng Was Not Trying to Sell Altered Versions of Mantis

The genesis of the government claim that Mr. Meng was attempting to sell an altered version of Mantis is from information provided by Quantum3D. Information alleging that Mr. Meng, "attempted to sell a 'hacked' version of 'Mantis' at a sales demonstration at a company in the PRC." [Criminal Complaint, pg. 2, ¶ 8.] The sole source for this claim is a Quantum3D-affiliated contractor in the PRC who claimed that Mr. Meng said that "he could offer this version of Mantis for a lower price than the victim company." [ PSR ¶ 13.] This Quantum3D-affiliated contractor was Mr. Meng's direct competitor for business in the PRC. This Quantum3D-affiliated contractor had a monetary motive to embellish his claims. After all, Mr. Meng was not selling Quantum3D hardware, but Orad hardware. If the PRC decided to buy freely available Mantis software, it would benefit Quantum3D, at least on the sale of its software, but the Quantum3D-affiliated contractor would be left out of the sale, and had commissions to lose. The defendant did without authorization use the Mantis 1.5.5 program to promote the sale of Orad hardware, however, he did not intend, and did not sell, a "hacked" version, or any version, of the Mantis 1.5.5 program. The PRC, if it decided to buy the Orad hardware, would have to decide what software to employ with it.

The government correctly states that defendant Meng used the Mantis 1.5.5 trade secret as part of a demonstration project in attempting to sell the hardware products of his new employer, Orad, and did so without the authorization of Quantum3D. [Gov't Memorandum, page 5:21 - 6:4.] However, Mr. Meng was not trying to sell a hacked version of the Mantis program to the PRC or its agencies. The Orad hardware could be used to operate a number of programs

---

[7] It also provides the evidence that Mr. Meng was owed money by Quantum3D, and did not want to ship the product out of China at his own expense considering the fact that they owed him salary and travel expenses.

1  similar to Mantis 1.5.5.  Of course, had the PRC wanted to buy Mantis to operate the Orad

2  hardware, they could have obtained a copy from Quantum3D, as Mantis according to the

3  Department of State is not subject to its licensing jurisdiction. [Government's Exhibit D, pg. 2.]

4  "The Mantis program is "dual-use and require[s] no modification for military." [Government's

5  Exhibit D: June 14, 2002, letter, page 2.]   In other words, the Mantis program used by the

6  defendant to operate the Orad hardware under the name DVG10 was not on the United States

7  Munitions List and may without authorization from the United States State Department be

8  exported from the United States to the PRC[8].

9  4.    Mr. Meng Is Not a Spy for a Foreign Government.

10       As preciously set forth, Mr. Meng has never been an agent of a foreign government.  He

11  did not use the viXen source code for any purpose outside his employment with Quantum3D.

12  When he used the Mantis 1.5.5 he did so for the purpose of promoting a sale of Orad's hardware

13  to the People's Republic of China Navy Research Center.  However, he was not an agent of the

14  PRC and not to provide a copy of the Mantis program to any PRC agency for use in research and

15  development. He did not use the Mantis program to assist the PRC in creating its own hardware,

16  nor did he assist them in designing their own hardware/software product.  Thus, the benefit to the

17  foreign government was a incidental byproduct of his sales of the Orad hardware product.  As

18  previously mentioned, the Mantis program was available in Asia when Mr. Meng went to the

19  PRC, and while he had the viXen source code, he did not have the viXen software.   More

20  importantly, he did not provide the viXen source code to the PRC.

21       When Mr. Meng put together a demonstration project for the People's Republic of China

22  Navy Research Center which included Orad, Ltd., hardware products.  Mr. Meng altered the

23  Mantis 1.5.5. version, by substituting the name Quantum3D with the name Orad.  Since Orad and

24  Quantum3D were competitors, he did not want to use the Quantum3D name as part of the

25  demonstration. [Plea Agreement, pg. 5: 23 - 28 thru 6: 1-6.]

26

[8]   See Footnote 4.

What is of great importance in this case is that Mr. Meng was not engaged in acts of espionage on behalf of a foreign government, but rather he was engaged in the pursuit of making sales on behalf of his employer Orad, Ltd., an Israeli based company. The September demonstration itself was attended by a Quantum3D affiliated contractor who notified his employer, Quantum3D, of Mr. Meng's use of Mantis. [PSR ¶ 13.] To put it simply, while Mr. Meng had viXen and the Mantis 1.5.5 in is possession, he did not pass these codes to agents of the People's Republic of China.

**CONCLUSION**

The thrust of the government's argument for 24 months in custody is that the defendant committed a serious crime which merits time in prison, notwithstanding his cooperation. As a careful reading of the facts indicates, Mr. Meng used the Mantis program to show his potential customer the abilities of his new employer's hardware. He did not sell nor attempt to sell a bootlegged copy of the Mantis program to the PRC, or any other foreign government agency. The only basis for that embellished claim that he was attempting to sell a "hacked" version of the program comes from a self-interested competitor whose claim has not been substantiated.

Additionally, Mr. Meng did not attempt to compile a visual simulation software program used for training military fighter pilots who use night vision sensor equipment, including thermal imaging. He never used nor attempted to use the viXen source code or the nVSensor source code for any purpose. Given Mr. Meng's limited use of the Quauntum3D product, his violations are not the type that warrants the severe sentence of 24 months in custody.

The defense requests that it impose the least amount of custody necessary to achieve §3553(a)'s purposes.

Dated: June 17, 2008

Respectfully,

_____/s/_____
Manuel U. Araujo,
Assistant Federal Public Defender